1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 10 | LEE WAYNE SIMPSON, ) | 1:09-CV-00896 LJO GSA HC |
| 11 | Petitioner, ) | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| 12 | v. ) | |
| 13 | LARRY SMALL, Warden, ) | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT |
| 14 | Respondent. ) | |
| 15 | _____) | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18 pursuant to 28 U.S.C. § 2254.

19                                    **BACKGROUND**[1]

20          Petitioner is currently in the custody of the California Department of Corrections pursuant to

21 a judgment of the Superior Court of California, County of Kern, following his conviction by jury

22 trial on September 1, 2006, of the premeditated murder of Daryth Fairbank (Cal. Pen. Code[2] §

23 187(a)), and being a felon in possession of a firearm (§ 12021(a)(1)).  The jury found true the

24 allegation that Petitioner personally and intentionally discharged a firearm during the commission of

25 the murder (§ 12022.53(d)).  In a bifurcated proceeding, the trial court found true the allegations that

26 _____

27          [1]This information is derived from the state court records lodged by Respondent with his response and is not subject to dispute.

28          [2]All further statutory references are to the California Penal Code unless otherwise indicated.

1   Petitioner had a prior strike conviction (§§ 667(c)-(j), 1170.12(a)-(e)); a prior serious felony

2   conviction (§ 667(a)); and served two prior prison terms (§ 667.5(b)).

3         The trial court sentenced Petitioner to consecutive terms of 50 years to life for the murder

4   conviction; 25 years to life for the personal use enhancement; five years for the prior serious felony

5   conviction; and one year for the prior prison term enhancement.

6         The California Court of Appeal, Fifth Appellate District (hereinafter "Fifth DCA"), affirmed

7   the judgment of the trial court on June 26, 2008.  Petitioner filed a petition for review in the

8   California Supreme Court on July 8, 2008.  The petition was summarily denied on September 24,

9   2008.

10        On May 21, 2009, Petitioner filed the instant federal habeas corpus petition.  He presents the

11  following four (4) claims for relief:  (1) There was insufficient evidence to support the deliberation

12  and premeditation requirements of his first-degree murder conviction; (2) the trial court violated

13  Petitioner's due process rights when it admitted evidence that was irrelevant and speculative and

14  tended to evoke bias and prejudice against him; (3) the trial court improperly excluded admissible

15  evidence that tended to support Petitioner's claim of self-defense; and (4) that Petitioner's

16  constitutional rights were violated by cumulative prejudicial errors by the trial court.  On December

17  1, 2009, Respondent filed an answer to the petition.  Petitioner filed a traverse on June 21, 2010.

18                              **STATEMENT OF THE FACTS**[3]

19        In February of 2006, Cathy Denson and Daryth Fairbank lived together in California
    City.  Denson and Fairbank knew [Petitioner] through mutual friends, and sometimes
20  Fairbank went places with [Petitioner] in [Petitioner's] green Ford pickup truck.  According
    to Denson, Fairbank was a drug user.  He both smoked the drugs and injected them with a
21  needle.

22        At around 8:30 in the evening on February 28, 2006, [Petitioner] went to Denson and
    Fairbank's house, and Fairbank left with [Petitioner] in a white pickup truck.  Fairbank told
23  Denson he would be back in half an hour.

24        Between 9:00 and 10:00 pm, [Petitioner] showed up at the apartment of his ex-
    girlfriend Devery Lee.  Devery's young son, her brother Daniel Lee, and several others were
25  present when [Petitioner] arrived.  [Petitioner] walked in and pulled various items out of his
    pockets, including an empty red shotgun shell.  He placed the items on the living room table.
26

27      _____

        [3]The Fifth DCA's summary of the facts in its June 26, 2008 opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2),

28  (e)(1).  Thus, the Court adopts the factual recitations as set forth by the Fifth DCA.

When Devery left the room, [Petitioner] told Daniel, "'I shot him, homes,'" and stated that Daniel no longer owed Fairbank any money.[FN2] Daniel later told an officer that [Petitioner] told him he no longer owed Fairbank $150 dollars. Daniel also told the officer there was a feud between [Petitioner] and Fairbank "over dope issues."

> FN2. Daniel Lee was in custody when he testified and had just been sentenced to two years on drug possession charges. He testified under a grant of immunity.

Around 10:30 pm, Denson saw [Petitioner] at a local liquor store and asked him where her "old man" was. [Petitioner] said he was getting ready to pick him up. Denson was suspicious and went outside and moved her car around the corner of the building. Denson, who was with a girlfriend at the time, waited until she saw [Petitioner] drive by in his green pickup truck and started to follow him. But [Petitioner] made a turn and headed back in the direction he came from. As he drove by Denson, [Petitioner] "looked right at" them. Denson and her friend decided to go home.

When Denson arrived home, Fairbank was still not there. Denson called [Petitioner], who told her that he had dropped Fairbank off in front of the house. Denson called [Petitioner] again between 2:00 and 3:00 in the morning, and [Petitioner] said he had dropped off Fairbank near the Texaco Express Lube. Denson called a third time between 4:00 and 6:00 in the morning. [Petitioner] again said he dropped Fairbank off in front of the house.

That same day, around 10:00 or 11:00 in the morning, [Petitioner] stopped by Devery Lee's house and told her he was going out of town.

Around 2:00 pm, Denson received a call from an unidentified person who told her he had seen "Shaggy" get shot and he himself had almost been shot. "Shaggy" was Fairbank's nickname. Denson went to look for Fairbank. When she could not find him, she filed a missing person's report.

Investigator Jeffrey Takeda met with Denson and later interviewed Daniel Lee. Based on information he received, Takeda drove to [Petitioner's] residence and saw his green truck parked behind the apartments. Takeda looked into the truck and saw a red duffel bag in the cab. Takeda knocked on the door of [Petitioner's] apartment, but got no answer.

The following day, Takeda and other officers executed a search warrant on [Petitioner's] apartment and found a single live .22-caliber round in a drawer, a box of live .22-caliber rounds in one of the bedrooms, a spent .22-caliber casing in the armrest of a recliner, and a live 12 gauge shotgun shell in the kitchen. On the entertainment center in the living room, the officers found "a drawing of a skull character with a cowboy hat on and holding a–what appears to be a sawed-off, double barreled shotgun in its right and a revolver pistol in its left hand."

That same day, Denson and friend again looked for Fairbank, this time by the airport. They found Fairbank's dead body in a desert area about one mile from the nearest house. Fairbank was lying face up with his legs extended and crossed, his arms extended, and his jacked pulled up underneath his head. Denson called the police.

Officer Anthony Flores arrived at the scene and found Denson, "hysterical, screaming, crying, yelling." Flores saw a pool of blood around Fairbank's head. Fairbank's wallet was found an unspecified distance from his body.

The following afternoon, [Petitioner] stopped by a restaurant in Mendocino County, approximately two hours north of San Francisco. He was driving his green pickup truck and was accompanied by a woman named Jenna. He met up with Kenneth Butin, a childhood

friend he saw every few years when he was in town.  [Petitioner] told Butin he was there to "hang out" and do some tattoo work.

[Petitioner], Jenna and Butin went to Butin's residence.  The three were "hanging out" for about an hour drinking beer and smoking marijuana.  After that [Petitioner] and Jenna drove to town, and about an hour and a half later, [Petitioner] returned to Butin's place by himself.

In the early evening, [Petitioner] told Butin he had shot and killed a man he originally met while in prison.  [Petitioner] told Butin he shot the man in the back with a sawed-off shotgun after the man tried to pull a gun on him.  [Petitioner] then picked up the man's gun, a .22-caliber pistol, and tried to shoot him in the head, but the gun misfired.  [Petitioner] told Butin this incident occurred in the desert and that he had expected the man to try to kill him, so he was ready for the attack.  [Petitioner] said he dragged the body into some brush to try to hide it.

While [Petitioner] was at Butin's house, he made multiple calls on Butin's cell phone. Butin heard parts of these telephone conversations.  Butin heard [Petitioner] say that he knew the body had been found and that the police were looking for him.  He also heard [Petitioner] say that the victim's girlfriend had seen him leave with the victim in a vehicle.

That evening [Petitioner] showed Butin two guns he brought with him in his duffel bag.  One was a pump-action, sawed-off shotgun with black electrical tape wrapped on the wooden parts of the gun.  Both the gun butt and barrel were sawed off.  The other gun was a blue or black steel revolver with fake bone grips.

Around 8:00 pm, Butin picked up a friend, Trevor Antill, and brought him back to the house to look at [Petitioner's] pickup, which [Petitioner] said he was interested in selling. While Butin and Antill were driving, Butin told him [Petitioner] had killed someone.  At the house, [Petitioner] told Antill he shot and killed someone because he was "getting rid of the trash."

The following morning, Antill called the sheriff's department and told them about his conversations with [Petitioner] and Butin.  Meanwhile, [Petitioner] and Butin went to the Hearst Bridge outside of Willits, and [Petitioner] dropped his guns into the Eel River. [Petitioner] and Butin returned to Butin's house.  The police arrived shortly thereafter and arrested [Petitioner].

[Petitioner's] truck was seized and searched.  An empty box of Remington .22-caliber ammunition was found inside.

Officer Takeda transported [Petitioner] from Mendocino County to Kern County. [Petitioner] told Takeda that "he knew he was looking at either life or the death penalty and there were other things that happened out there."

Evidence was received at trial that, approximately two to four weeks before the murder, Devery Lee had seen a shotgun and a revolver she believed was a .22-caliber gun in the duffel bag [Petitioner] used to carry his tattoo supplies.  And during a Christmas party in December of 2005, [Petitioner] told his boss at the time that we owned a sawed-off shotgun.

Four months after the incident, a .22-caliber pistol was found in the Eel River, 20 to 30 feet downstream from the Hearst Bridge.  The barrel of a 12 gauge shotgun was subsequently found on the sand bar about 100 feet downstream from the Hearst Bridge.

The tread pattern and size of [Petitioner's] boots were consistent with some of the

1  track patterns found at the crime scene.  And tires from [Petitioner's] truck "had consistent
2  tread design, tread pattern, wear pattern and size" as the impressions of the tire tracks found
   at the scene.

3      An autopsy performed by Dr. Debra Hanks on Fairbank revealed quite a few bruises
4  and abrasions.  He also had a large, gaping gunshot entrance wound to the lower back portion
   of his head.  Dr. Hanks found bleeding with the scalp and brain, fractures of the skill that
5  extended over the top of the head, and pulverized brain materiel.  Dr. Hanks found the
   injuries consistent with a single shotgun wound, which was deemed the cause of death.

6      During the autopsy, Dr. Hanks removed six shotgun pellets and a "deformed two
7  component 12-gauge polyethylene shot cup" or "wadding" from the gunshot wound, which
   indicated the shot occurred at "very close range."

8  (See Resp't's Lodged Doc. 4.)

9                              **DISCUSSION**

10  I.    Jurisdiction

11     Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

12  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

13  the United States.  28 U.S.C. § 2254(a) (2010); 28 U.S.C. § 2241(c)(3) (2010); Williams v. Taylor,

14  529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

15  guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kern County

16  Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. §§ 2254(a),

17  2241(d).

18     On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

19  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

20  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997),

21  cert. denied, 522 U.S. 1008 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996),

22  cert. denied, 520 U.S. 320 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320

23  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

24  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

25  II.    Standard of Review

26     The instant petition is reviewed under the provisions of the AEDPA which became effective

27  on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petitioner can

28  prevail only if he can show that the state court's adjudication of his claim:

1  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2

3  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4  28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

5  As a threshold matter, this Court must "first decide what constitutes 'clearly established

6  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

7  quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

8  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

9  of the relevant state-court decision."  Id., quoting Williams, 592 U.S. at 412.  "In other words,

10  'clearly established Federal law' under 28 U.S.C. § 2254(d)(1) is the governing legal principle or

11  principles set forth by the Supreme Court at the time the state court renders its decision."  Id.

12  Finally, this Court must consider whether the state court's decision was "contrary to, or

13  involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

14  quoting 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant

15  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

16  question of law or if the state court decides a case differently than [the] Court has on a set of

17  materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

18  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

19  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

20  that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

21  "[A] federal court may not issue the writ simply because the court concludes in its

22  independent judgment that the relevant state court decision applied clearly established federal law

23  erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

24  federal habeas court making the "unreasonable application" inquiry should ask whether the state

25  court's application of clearly established federal law was "objectively unreasonable."  Id. At 409.

26  Petitioner has the burden of establishing that the decision of the state court is contrary to or

27  involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

28  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

1   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

2   decision is objectively unreasonable.  See Duhaime v. Ducharne, 200 F.3d 597, 600-01 (9th Cir.

3   1999).

4           AEDPA requires that we give considerable deference to state court decisions.  "Factual

5   determinations by state courts are presumed correct absent clear and convincing evidence to the

6   contrary, 28 U.S.C. § 2254(e)(1), and a decision adjudicated on the merits in a state court and based

7   on a factual determination will not be overturned on factual grounds unless objectively unreasonable

8   in light of the evidence presented in the state court proceedings, 28 U.S.C. § 2254(d)(2)."  Miller-El

9   v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

10  findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393

11  F.3d 943, 976-77 (2004).

12  III.    Review of Claims

13          A.  Sufficiency of Evidence of Premeditation and Deliberation in Violation of Due Process

14          Petitioner first alleges there was insufficient evidence to support the deliberation and

15  premeditation requirements of his first-degree murder conviction.  Respondent contends Petitioner is

16  incorrect and the state court reasonably rejected the claim.

17          Petitioner presented this claim on direct appeal to the Fifth DCA and California Supreme

18  Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks

19  through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the

20  last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 &

21  n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with

22  lower court's reasoning where former affirms latter without discussion); see also LaJoie v.

23  Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state

24  court opinion in determining whether state court's rejection of petitioner's claims was contrary to or

25  an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

26          In denying Petitioner's claim, the appellate court stated as follows:

27          1. Sufficiency of Evidence of Premeditation and Deliberation

28                  [Petitioner] contends the evidence of premeditation and deliberation was insufficient

1    to support his first degree murder conviction. We disagree.

2        In reviewing the sufficiency of the evidence to support a conviction, we determine
3    "'whether from the evidence, including all reasonable inferences to be drawn therefrom, there
     is any substantial evidence of the existence of each element of the offense charged.'
4    [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13.) Under such standard, we
     review the facts adduced at trial in full and in the light most favorable to the judgment,
5    drawing all inferences in support of the judgment, to determine whether there is substantial
     direct or circumstantial evidence the defendant committed the charged crime. (*People v.*
6    *Hillhouse* (2002) 27 Cal.4th 469, 496; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) The test
     is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial
7    evidence, of credible and solid value, supports the jury's conclusions. (*People v. Arcega*
     (1982) 32 Cal.3d 504, 518; *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 996.)

8        In making the determination, we do not weigh the evidence; the credibility of
9    witnesses and the weight to be accorded to the evidence are matters exclusively within the
     province of the trier of fact. (Evid. Code, § 312.) We simply consider whether """*any* rational
10   trier of fact could have found the essential elements of [the charged offense] beyond a
     reasonable doubt."' [Citations.]" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081.) Unless it is
11   clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to
     support the verdict" the conviction will not be reversed. (*People v. Hicks* (1982) 128
12   Cal.App.3d 423, 429.)

13       With particular regard to determining whether a jury's finding of first degree murder
     based upon premeditation and deliberation, as in this case, is supported by substantial
14   evidence, the test is whether a rational trier of fact could have found premeditation and
     deliberation beyond a reasonable doubt based on the evidence presented. (*People v. Villegas*
15   (2001) 92 Cal.App.4th 1217, 1223.)

16       "A verdict of deliberate and premeditated first degree murder requires more
     than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of
17   considerations in forming a course of action; 'premeditation' means thought over in
     advance. [Citations.] 'The process of premeditation and deliberation does not require
18   any extended period of time. "The true test is not the duration of time as much as it is
     the extent of reflection. Thoughts may follow each other with great rapidity and cold,
19   calculated judgment may be arrived at quickly .." [Citations.]' [Citation.]" (*People v.*
     *Koontz* (2002) 27 Cal.4th 1041, 1080.)

20       [Petitioner] relies on the analysis used in *People v. Anderson* (1968) 70 Cal.2d 15
     (*Anderson*), which identified three factors commonly present in premeditated murder cases,
21   i.e., planning activity, motive, and manner of killing. (*Id.* at pp. 26-27.) [Petitioner] argues the
     evidence in this case shows that, while the killing of Fairbank may have been intentional,
22   there was no evidence of prior planning or motive, and the killing was not an
     "execution-style" murder as argued by the prosecution.

23       These *Anderson* factors need not all be present to sustain a finding of premeditation
24   and deliberation. (*People v. Garcia* (2000) 78 Cal.App.4th 1422, 1427.) And, although a
     reviewing court may consider the analysis employed in *Anderson*,

25       "[u]nreflective reliance on *Anderson* for a definition of premeditation is
26   inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing
     courts in assessing whether the evidence supports an inference that the killing resulted
27   from preexisting reflection and weighing of considerations. It did not refashion the
     elements of first degree murder or alter the substantive law of murder in any way.'
28   [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative.

1

2

'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citation.]" (*People v. Koontz*, supra, 27 Cal.4th at p. 1081.)

3

Here, there was sufficient evidence to sustain a finding of willful, deliberate and premeditated murder under the *Anderson* guidelines.

4

5

6

We agree that there is little evidence of prior planning of the murder, other than the fact that [Petitioner] was known to have guns in his possession and that, on the night of the incident, [Petitioner] went to Denson and Fairbank's home and left with only Fairbank around 8:30 in the evening.

7

8

9

10

But there is evidence of possible motive for the murder. When [Petitioner] appeared at Devery Lee's house some 30 to 90 minutes after he first left with Fairbank, he told Daniel Lee that he had shot Fairbank and that Daniel no longer need worry about the money he owed Fairbank. Daniel told Officer Takeda there was a "feud over dope" between Fairbank and [Petitioner] and that Fairbank told Daniel [Petitioner] had provided "not so good dope" to Fairbank and "never made it right." When [Petitioner] described the murder to Antill a few days later, he told him he shot and killed someone because he was "getting rid of the trash."

11

12

13

14

In addition, there is sufficient evidence that the manner of killing involved premeditation and deliberation. [Petitioner] drove Fairbank to a remote location in the desert before shooting him. Fairbank was killed by a single shotgun blast to the lower back portion of his head. The "shotcup" or "wadding" was found inside the wound, and the pellets removed from Fairbank's head were deformed. Based on this evidence, the medical examiner concluded that the shot occurred at "very close range."

15

16

The facts in this case provide sufficient evidentiary basis for a reasonable jury to infer that [Petitioner] had a motive to kill Fairbank and that he carried out his intent to kill in such a reflective manner as to support the finding that the murder was deliberate and premeditated.

17 (<u>See</u> Resp't's Lodged Doc. 4)

18      The law with regards to insufficiency of evidence claims is clearly established.  The United

19 States Supreme Court has held that when reviewing an insufficiency of the evidence claim on

20 habeas, a federal court does not "ask itself whether *it* believes that the evidence at the trial

21 established guilt beyond a reasonable doubt." <u>Woodby v. INS</u>, 385 U.S. 276, 282 (1966) (emphasis

22 added).  Rather, it must determine whether, viewing the evidence and the inferences to be drawn

23 from it in the light most favorable to the prosecution, *any* rational trier of fact could find the essential

24 elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

25 Sufficiency claims are judged by the elements defined by state law <u>Id.</u> at 324 n.16.  Petitioner was

26 convicted under § 187(a), defining murder as "the unlawful killing of a human being, or a fetus, with

27 malice aforethought."  Under California law, the elements required for a finding of murder in the

28 first degree include any "willful, deliberate, and premeditated killing."  Cal. Penal Code § 189.  As

1   cited by the Fifth DCA in this case,

2           "A verdict of deliberate and premeditated first degree murder requires more than a
        showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations
3       in forming a course of action; 'premeditation' means thought over in advance. [Citations.]
        'The process of premeditation and deliberation does not require any extended period of time.
4       "The true test is not the duration of time as much as it is the extent of reflection. Thoughts
        may follow each other with great rapidity and cold, calculated judgment may be arrived at
5       quickly .." [Citations.] [Citation.]" People v. Koontz, 27 Cal.4th 1041, 1080 (2002).

6       The question this court must ask is, viewing the evidence and the inferences to be drawn

7   from it in the light most favorable to the prosecution, whether *any* rational trier of fact could have

8   found that the elements of premeditation and deliberation were present beyond a reasonable doubt in

9   Petitioner's case.

10      Petitioner's claim is that there was not sufficient evidence that the killing was "execution

11  style," the argument being that the premeditation and deliberation elements of his conviction hinged

12  on this determination.  According to the record, evidence was admitted that the victim was killed by

13  a single shotgun blast to the lower back portion of his head.  Also, the "shot cup" or "wadding" was

14  found inside the wound, and all six shotgun pellets that were removed from the wound were

15  deformed.  The medical examiner used this evidence to conclude that the shot occurred at "very

16  close range."  Petitioner points to the lack of any powder burns on the body – which would signify a

17  very close range gunshot – and to the lack of evidence that the victim was forced into a vulnerable

18  position before being shot.  Despite the lack of powder burns and the question of the victim's

19  position when shot, there is sufficient evidence here (specifically the facts that the shot was at close

20  range and to the back of the head) for a rational trier of fact to conclude that this was an "execution-

21  style" killing.

22      Under California law, evidence of an "execution-style" homicide can be used to infer

23  premeditation and deliberation.  People v. Lenart, 32 Cal.4th 1107, 1127 (2004); People v. Hawkins,

24  10 Cal.4th 920, 957 (1995).  While the evidence that this killing was committed "execution-style"

25  was used by the trial court to infer the necessary elements of premeditation and deliberation, it was

26  by no means the only evidence the jury had to rely on to satisfy these elements.

27      California courts have identified three common indicators that a killing was deliberate and

28  premeditated: (1) planning, (2) motive, and (3) a particular or exacting manner of killing.  People v.

1 | Anderson, 70 Cal.2d 15, 27 (1968).  Later courts have held that not all three of these indicators need

2 | be present to sustain a finding of premeditation and deliberation.  People v. Garcia, 78 Cal.App.4th

3 | 1422, 1427 (2000); People v. Pride, 3 Cal.4th 195, 247 (1992).  The individual Anderson factors

4 | may be taken in balance, and merely serve as a guideline to assess whether the elements of

5 | premeditation and deliberation are present.  See People v. Perez, 2 Cal.4th 1117, 1125 (1992).

6 | In addition to the evidence that the manner of killing was "execution-style," there is evidence

7 | in the record of a possible motive for the murder – that Petitioner was involved in a dispute over

8 | drugs with the victim.  Also, there is evidence Petitioner picked up the victim from his house and

9 | drove him to a remote desert location before shooting him.

10 | Petitioner, in his traverse, makes a large number of arguments attacking the credibility of

11 | prosecution witnesses and their testimony, as well as questioning what may be inferred from that

12 | testimony.  "[A] federal habeas corpus court faced with a record of historical facts that supports

13 | conflicting inferences must presume-even if it does not affirmatively appear in the record-that the

14 | trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

15 | resolution."  Jackson, 443 U.S. at 326; See 28 U.S.C. § 2254(e)(1); Miller-El, 537 U.S. at 340.

16 | Determining the credibility of witnesses and the relative weight to be attributed to their testimony is

17 | not within the realm of this Court sitting in a habeas proceeding.  These are questions of fact to be

18 | determined by the jury, and thus may not be considered in the instant case.

19 | Based on the evidence presented in this case, it is clear that the evidence presented was

20 | sufficient for a rational trier of fact to conclude that Petitioner committed the crime of murder with

21 | premeditation and deliberation.  As Petitioner fails to demonstrate that the state court's decision was

22 | "contrary to, or involved an unreasonable application of, clearly established Federal law," or an

23 | "unreasonable determination of the facts in light of the evidence," the claim is rejected.  28 U.S.C. §

24 | 2254(d).

25 | B.  Admission of Skull and Guns Drawing Seized in Petitioner's Apartment

26 | Petitioner's second claim alleges the trial court erred in admitting evidence that was

27 | speculative and tended to evoke bias and prejudice in the form of a drawing seized by police from

28 | his apartment that depicted a skull/skeleton wearing a cowboy hat and holding a double-barreled

1  shotgun in its right hand and a revolver pistol in his left hand.  This claim was also presented on

2  direct appeal to the Fifth DCA where it was rejected.  The appellate court issued the last reasoned

3  decision, as follows:

4           *2. Admission of Drawing that was Seized in [Petitioner's] Apartment*

5          During the search of [Petitioner's] apartment, the police seized "a drawing of a skull
   character with a cowboy hat on and holding a-what appears to be a sawed-off double barreled
6  shotgun in its right hand and a revolver pistol in its left hand." [Petitioner] argues that the
   trial court erred by admitting the drawing because the evidence was cumulative and its
7  prejudice outweighed its probative value. He also asserts that the evidence violated his due
   process rights because it suggested that he had a morbid fascination with guns. We disagree.
8
9          During trial, the prosecution argued that the drawing was relevant because it tended to
   tie [Petitioner] to the crime. According to the prosecution, the picture depicted a person with
   a shotgun and a pistol, consistent with "what occurred in this case." The prosecutor argued
10 further that the drawing negated [Petitioner's] version of the events, which was that the pistol
   belonged to the victim and that the victim had tried to kill him.

11
12         Defense counsel argued that the relevance of the drawing "if any, is outweighed by
   the prejudicial effect." Defense counsel noted that [Petitioner] was a tattoo artist and "who
13 knows what sort of things are around the apartment."

14         The trial court found the drawing relevant because it depicted a sawed-off shotgun
   and a revolver. "If this were a case in which knives were used, a machine gun was used,
   automatics were used, I would probably rule differently. But this, I think, ties [Petitioner]-I
15 think there is some relevance tying [Petitioner] to owning or possessing those two guns, and
   that seems to be a main issue in this case." The court found further that the prejudicial effect
16 did not outweigh its probative value.

17         Evidence Code section 352 provides: "The court in its discretion may exclude
   evidence if its probative value is substantially outweighed by the probability that its
18 admission will (a) necessitate undue consumption of time or (b) create substantial
   danger of undue prejudice, of confusing the issues, or of misleading the jury."

19
20         Evidence Code section 352 gives the trial court discretion to exclude cumulative
   evidence. (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843-1844.) Under that section, the
   court has broad discretion to assess whether the probative value of particular evidence is
21 outweighed by concerns of undue prejudice, confusion or consumption of time. (Evid. Code,
   § 352; *People v. Lewis* (2001) 26 Cal.4th 334, 374.) We will not disturb a ruling under
22 Evidence Code section 352 unless the trial court exercised its discretion in an arbitrary,
   capricious or patently absurd manner that resulted in a manifest miscarriage of justice.
23 (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438.)

24         The type of prejudice that Evidence Code section 352 was meant to avoid is not
   prejudice or damage to a defense that naturally flows from relevant, highly probative
25 evidence. "'[All] evidence which tends to prove guilt is prejudicial or damaging to the
   defendant's case. The stronger the evidence, the more it is "prejudicial."'" (*People v. Karis*
26 (1988) 46 Cal.3d 612, 638.) Rather, evidence should be excluded as unduly prejudicial when
   it uniquely tends to evoke an emotional bias against the defendant as an individual and has
27 very little effect on the issues. (*People v. Coddington* (2000) 23 Cal.4th 529, 588, overruled
   on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v.*
28 *Branch* (2001) 91 Cal.App.4th 274, 286.)

Here, the question was whether [Petitioner] intentionally and deliberately murdered Fairbank or whether he shot him in self-defense. Devery Lee testified that she saw [Petitioner] with a sawed-off shotgun and a revolver prior to the shooting. And [Petitioner's] former boss testified that [Petitioner] told him two months before the shooting that he possessed a sawed-off shotgun. Butin and Antill both testified that [Petitioner] told them he shot someone but, while he had both a sawed-off shotgun and a revolver in his possession, he claimed that he got the revolver from the victim when the victim tried to shoot him. Because the testimony of Butin and Antill contradicted certain aspects of whether [Petitioner] owned the two guns, and thereby whether [Petitioner's] shooting of the victim was in self-defense, their testimony was not merely corroborative and thus not entirely cumulative of evidence produced by the other two witnesses. (Cf. *People v. Buckley* (1986) 185 Cal.App.3d 512, 524-525 [testimony of proffered witnesses would have been cumulative because it was clearly repetitious and added no new dimensions to the case].) Even if some of the evidence was similar and therefore cumulative, the trial court is not required to exclude all cumulative evidence. (*People v. Lang* (1989) 49 Cal.3d 991, 1016.) Rather, evidence having substantial relevance to prove material facts which are contested and central to the case is not "merely cumulative" so as to require exclusion. (*Ibid.*; *People v. Anderson* (1987) 43 Cal.3d 1104, 1137.)

We find that the trial court did not abuse its discretion. The issue of whether [Petitioner] possessed a sawed-off shotgun and a revolver was in dispute. The trial court could reasonably conclude that the probative value of the drawing, showing a sawed-off shotgun and a revolver, was highly probative and outweighed concerns of undue prejudice.

In any event, any error in admitting the evidence was harmless. (Evid. Code, § 353; *People v. Ayala* (2000) 23 Cal.4th 225, 271; *People v. Earp* (1999) 20 Cal.4th 826, 878 [judgment not reversed for erroneous admission of evidence unless error complained of results in a miscarriage of justice]; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Based upon other evidence presented at trial, it is not reasonably probable that [Petitioner] would have enjoyed a more favorable result had the drawing been excluded. The evidence of guilt was strong and largely uncontroverted.

But we note further that [Petitioner] does not only base his appeal on the simple argument that the court's ruling admitting the drawing violated the rule of evidence and prejudiced the verdict. He also argues that his federal constitutional rights were violated.

To determine whether an evidentiary ruling denied [Petitioner] due process of law, "the presence or absence of a state law violation is largely beside the point" because "failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis" for granting relief on federal due process grounds. (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919-920.) And while the *Watson* standard applies to prejudicial error analysis for errors of state law, the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 applies to similar analysis for federal constitutional errors. (*People v. Boyette* (2002) 29 Cal.4th 381, 428.)

In return for these advantages, however, [Petitioner] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial: "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp, supra*, 926 F.2d at p. 920.) "The dispositive issue is whether the trial court committed an error which rendered the trial 'so "arbitrary and fundamentally unfair" that it violated federal due process.' [Citations.]" (*Reiger v. Christensen* (9th Cir. 1986) 789 F.2d 1425, 1430.)

The challenged evidence was not evidence from which "no permissible inferences" could be drawn by the jury. (*Jammal v. Van de Kamp, supra*, 926 F.2d at p. 920.) The jury could infer from the drawing that [Petitioner] did possess both a sawed-off shotgun and a revolver, as testified to by witnesses, and as evidenced by his having the two weapons in his possession when he saw Butin and Antill.

Even if there were no permissible inferences to be drawn from the challenged testimony, it was not evidence "'of such quality as necessarily prevents a fair trial.'" (*Jammal v. Van de Kamp, supra*, 926 F.2d at p. 920.) The drawing was a small part of the evidence of [Petitioner's] guilt. Several people testified that [Petitioner] owned or was in possession of a sawed-off shotgun and a handgun. [Petitioner] told several people that he shot and killed Fairbank, and Butin saw him throw a sawed-off shotgun and a revolver into the Eel River. The tread pattern and size of [Petitioner's] boots and the tires from his truck were consistent with some of the track patterns found at the crime scene. And the evidence was that [Petitioner] drove Fairbank to a remote location and shot him in the head at close range.

In light of this evidence, the drawing is not of great significance. When Officer Takeda was questioned about the drawing on the stand, he explained that he seized the drawing and briefly described it. During closing argument, the prosecutor mentioned the drawing but made no effort to magnify its importance, stating,

"There is the search warrant that [Officer Takeda] does. And in [Petitioner's] residence, in the living room, [the drawing is] described as being displayed on some kind of cabinetry in the living room of [Petitioner's] place. Where he lives by himself, there is a drawing on a piece of cardboard. And that drawing has what looks to be a skeleton skull, hat on top of it, like an overcoat and in one hand sawed-off shotgun, in the other a hand revolver."

The evidence does not come close to being evidence that "'necessarily prevents a fair trial.'" (*Jammal v. Van de Kamp, supra*, 926 F.2d at p. 920.) As in *People v. Boyette*, [Petitioner] here "attempt[s] to inflate [a] garden-variety evidentiary question[] into [a] constitutional one .." (*People v. Boyette, supra*, 29 Cal.4th at p. 427.) We are not persuaded by the attempt.

[Petitioner] cites *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, in which it was held that the erroneous admission of evidence constituted a deprivation of a fair trial in violation of the due process clause of the Fourteenth Amendment. In *McKinney v. Rees*, the victim, the defendant's mother, died after her throat was slit. The medical examiner testified that the cuts could have been made by any kind of knife, and no murder weapon was ever identified. (*Id.* at p. 1381.) The court admitted evidence that the defendant possessed a Gerber knife that was confiscated by a police officer four months earlier, and that he owned a Tekna knife around that same time. There was conflicting evidence that the defendant was no longer in possession of the Tekna knife. There was also evidence presented that the defendant was proud of his knife collection, that on occasion he strapped a knife to his body while wearing camouflage pants, and that he used a knife to scratch the words "Death is His" on the door to his closet in his dormitory. The prosecutor questioned the defendant about his "fascination" with knives. During closing argument, the prosecutor described his case as concentrating on three things, one of which was "'any knives the defendant may have owned.'" (*Id.* at p. 1382.)

The court in *McKinney v. Rees* concluded that much of the disputed evidence was "other act" evidence probative only of character and therefore irrelevant, and determined further that the admission of the evidence constituted a violation of the due process clause. (*McKinney v. Rees, supra*, 993 F.2d at pp. 1384-1386.) "Because of the lack of a 'weighty' case against [the defendant], and pervasiveness of the erroneously admitted evidence throughout the trial, we think it 'highly probable that the error had substantial and injurious

1    effect or influence in determining the jury's verdict.' [Citation.]" (*Id.* at p. 1386.)

2        We find *McKinney v. Rees* is not comparable to [Petitioner's] situation, largely
     because the evidence here creates a permissible inference that can be drawn from the
3    challenged evidence and, in any event, did not have a major impact on the defense.

4        For the reasons set forth above, the admission of the drawing did not deny [Petitioner]
     due process of law.
5

(See Resp't's Lodged Doc. 4)
6

7        As a federal court in a habeas proceeding, we do not review questions of state evidence law.

8    Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or

9    involved an unreasonable application of, clearly established Federal law, as determined by the

10   Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, the question here is not

11   whether the state's admission of the evidence violated state evidentiary rules, but whether the

12   admission of that evidence was an error so serious that the trial was rendered so arbitrary and

13   fundamentally unfair as to violate Petitioner's constitutional rights to due process. Reiger v.

14   Christensen, 789 F.2d 1425, 1430 (9th Cir. 1986); Jamaal v. Van de Kamp, 926 F.2d 918, 920 (9th

15   Cir. 1991). It is, in fact, possible for a state court to violate its rules of evidence without resulting in

16   a trial so unfair as to violate due process. Jamaal, 926 F.2d at 919. "A state court's evidentiary

17   rulings can form the basis for habeas relief under the due process clause only when they were so

18   conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant

19   of due process." Osborne v. Purkett, 411 F.3d 911, 917 (8th Cir. 2005) (citing Parker v. Bowersox,

20   94 F.3d 458, 460 (8th Cir. 1996)), cert. denied, 547 U.S. 1022 (2006).

21       The evidence in question was introduced by the prosecution, and the trial court deemed it

22   relevant because the drawing depicted a skull holding a shotgun and a revolver. The victim in this

23   case had been shot with a shotgun. Petitioner's self-defense claim alleged that the victim had

24   threatened him with a revolver-type .22 caliber pistol, and that he had taken that revolver into his

25   possession following the shooting. Contrary evidence indicated that Petitioner had in his possession

26   a shotgun and a .22 caliber revolver-type pistol *both before and after* the shooting. The drawing was

27   used by the prosecution to discredit Petitioner's claim and corroborate evidence that he did in fact

28   have a .22 caliber revolver prior to the shooting.

1    Petitioner argues that the prosecution's inferences about the drawing were speculative and

2    that "the drawing had a highly damaging potential to evoke bias, and was used by prosecution for

3    shock effect to help push the jury to a first degree premeditation conviction . . .."  Petitioner's

4    Habeas Petition B.

5    The record in this case does not support the contention that the admission of the drawing in

6    question was prejudicial to such a magnitude that Petitioner's trial was rendered fundamentally

7    unfair.  To the contrary, the Fifth DCA, in its detailed review of the evidence ruling in question,

8    determined that admission of the drawing complied with California Evidence Code § 352, which

9    provides:  "The court in its discretion may exclude evidence if its probative value is substantially

10   outweighed by the probability that its admission will (a) necessitate undue consumption of time or

11   (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

12   The Fifth DCA held that the trial court did not abuse its discretion in admitting the drawing

13   as evidence as it was directly relevant to facts that were in dispute.  Further, they held that the

14   drawing was not cumulative in nature, was highly probative, and outweighed concerns of undue

15   prejudice.  The Fifth DCA concluded that even if there was error in admitting the evidence, that it

16   was harmless given that in light of all the other evidence produced at trial, it is unlikely that

17   Petitioner would have enjoyed a more favorable ruling had it been excluded.  See Resp't's Lodged

18   Doc. 4.  This court agrees.

19   In his traverse, Petitioner argues that the evidence was so highly prejudicial that the trial

20   court should have excluded the evidence under Cal. Evid. Code § 352.  As we have stated, it is not

21   generally within the scope of this Court to question the decision of the state courts in evidentiary

22   matters.  This Court may issue a writ only if there is a clear abuse of discretion so as to violate

23   constitutional rights to due process.  Petitioner correctly points out that "admission of evidence to do

24   nothing more than to demonstrate disposition to commit crimes is a due process violation."  Resp't's

25   Traverse, 9.  However, in this case, the evidence was clearly used for something more than simply

26   "to demonstrate disposition to commit a crime."

27   Petitioner has the burden of showing that the admission of the drawing caused him to receive

28   a fundamentally unfair trial which deprived him of his rights to due process.  Petitioner did not meet

1   this burden.  The evidence in question was relevant to material facts in dispute in the case, and, as

2   the state trial and appellate courts have held, its probative value outweighed any potential prejudice.

3   Furthermore, given all of the other evidence presented in this case, it is unlikely that the exclusion of

4   the drawing would have resulted in a more favorable ruling.  As Petitioner fails to demonstrate that

5   the state court's decision was "contrary to, or involved an unreasonable application of, clearly

6   established Federal law," or an "unreasonable determination of the facts in light of the evidence," the

7   claim is rejected.  28 U.S.C. § 2254(d).

8        C.  Exclusion of Evidence of Fairbank's Alleged Possession of Firearms

9        Petitioner's third claim alleges that the trial court erred in excluding evidence that the victim

10  had possessed firearms, which would have supported Petitioner's claim of self-defense.  Petitioner

11  points to two specific pieces of evidence: (1) the testimony of Jesse Cotillier who would have stated

12  that the victim had "placed a gun, wrapped in a curtain on his porch," in May of 2005 and (2) that the

13  victim had a felony conviction on weapons charges in September of 2000.  This claim was also

14  presented on direct appeal to the Fifth DCA where it was rejected.  The appellate court issued the

15  last reasoned decision, as follows:

16        *3. Exclusion of evidence of Fairbank's Alleged Possession of Firearms*

17        [Petitioner] contends that the trial court erred when it excluded evidence regarding
     Fairbank's alleged possession of firearms, which would have supported [Petitioner's] claim
18   of self-defense. He also claims exclusion of the evidence denied him his constitutional right
     to present a defense. We disagree.
19
          Prior to trial, the prosecutor objected to the proposed testimony of Jesse Cotillier,
20   who would allegedly testify that Fairbank put a rifle wrapped in a curtain on the porch of
     Cotillier's apartment in May of 2005. Defense counsel claimed that this testimony was
21   offered to show Fairbank had access to guns and tended to carry a gun, which would
     corroborate [Petitioner's] self-defense account of the shooting.
22
          The trial court found the fact that the victim was carrying a rifle nine months prior to
23   the shooting irrelevant and speculative and could confuse the jury, but noted, "If the victim
     had been seen with the .22, different ruling." The court did state that if the People "put on
24   any evidence that the alleged victim did not carry guns or did not have guns in his
     possession, I'll reverse myself because I think that opens the door."
25
          During trial, defense counsel requested to introduce into evidence Fairbank's
26   September 2000 felony conviction for possession of a gun. The prosecutor argued that the
     conviction was irrelevant, far too remote, and speculative. Other than the aforementioned
27   incident when Fairbank left a rifle at Cotillier's apartment, defense counsel acknowledged
     that he did not have any information that Fairbank had a reputation for carrying a weapon.
28   The trial court denied the request, stating that it was irrelevant and was "too remote" and

speculative. The court did state that, had the victim "been convicted of a 245 with a gun," most likely referring to a section 245 assault with a deadly weapon, the ruling might be different.

When self-defense is raised in a homicide case, evidence of the victim's aggressive and violent behavior is generally admissible to show the victim was more likely the aggressor. (Evid. Code, § 1103, subd. (b); *People v. Wright* (1985) 39 Cal.3d 576, 587.) Under Evidence Code section 1103, such character traits can be shown by evidence of specific acts of the victim on third party persons as well as by general reputation evidence. (*People v. Thomas* (1969) 269 Cal.App.2d 327, 328.) "[O]f course, a defendant's evidence of self-defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 [only relevant evidence is admissible] and 352." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

A decision to exclude evidence comes within the trial court's broad discretionary powers and "will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) Nevertheless, Evidence Code section 352 "must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) As our Supreme Court has cautioned, "'trial judges in criminal cases should give a defendant the benefit of any reasonable doubt when passing on the admissibility of evidence as well as in determining its weight.'" (*People v. Wright, supra,* 39 Cal.3d at pp. 584-585.) Even "'"the best Judge may err"'" concerning questions as to the admissibility of evidence arising "'"in the hurry of a trial,"'" thus, whenever "'"the evidence proposed by the defense is not plainly inadmissible,"'" both trial courts and prosecutors are well advised to let the evidence go before the jury, rather than risk reversal or a miscarriage of justice by barring its admission. (*Ibid.,* quoting *People v. Murphy* (1963) 59 Cal.2d 818, 829.)

Here, we agree with the trial court rulings that the proffered evidence was irrelevant and therefore "plainly inadmissible." (*People v. Murphy, supra,* 59 Cal.2d at p. 829.) Evidence Code section 210 defines "relevant evidence" as "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Evidence is irrelevant if it invites speculation-"'[i]f the inference of the existence or nonexistence of a disputed fact which is to be drawn from proffered evidence is based on speculation, conjecture, or surmise, the proffered evidence cannot be considered relevant evidence.'" (*People v. Louie* (1984) 158 Cal.App.3d Supp. 28, 47, italics omitted.) And while the trial court maintains a broad discretion to determine evidentiary issues, it cannot admit irrelevant evidence. "Irrelevant evidence must be excluded; a trial court has no discretion to admit it." (*People v. Thompson* (1981) 127 Cal.App.3d 13, 18.)

The evidence that Fairbank was in possession of a rifle some nine months before the shooting was irrelevant, specifically, as noted by the trial court, because the weapon Fairbank allegedly had was a rifle as opposed to a handgun. The evidence of Fairbank's 2000 conviction for being a felon in possession of a gun was remote and also irrelevant, specifically because there was no other evidence that Fairbank had a reputation for carrying a weapon or for aggression. We agree with the trial court's rulings and reject [Petitioner's] claim to the contrary.

Even assuming the trial court should have admitted the proffered evidence, the exclusion was not prejudicial. There was substantial evidence of premeditation and deliberation on [Petitioner's] part in that [Petitioner] was in possession of at least two weapons, he went to Fairbank's home and then drove him to a remote location where he shot him in the head at close range. Under these circumstances, it is not reasonably probable that admission of evidence that Fairbank had possession of a rifle some nine months earlier and

that he had been convicted of being a felon in possession of a weapon almost six years earlier would have resulted in a more favorable verdict. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Arias* (1996) 13 Cal.4th 92, 157.)

[Petitioner] also argues that the court's ruling deprived him of his constitutional right to present a defense, so that the ruling must be considered prejudicial unless it is shown to have been harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.) While "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense [citations]," the accused "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) Moreover, the deprivation of the right to present a defense occurs only where there is a "complete exclusion of evidence intended to establish an accused's defense .." (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 999.) Exclusion of a particular item of evidence is not a deprivation of the right to present a defense where the defendant could have presented a defense through other means. (*People v. Maury* (2003) 30 Cal.4th 342, 414.)

[Petitioner] was not prevented from presenting a defense that he was in fear for his life. Both Butin and Antill testified that [Petitioner] had told them he shot Fairbank after Fairbank tried to shoot him. At most, [Petitioner] "was barred merely from introducing [evidence] to bolster his own credibility, in support of his extrajudicial statements." (*People v. Maury*, *supra*, 30 Cal.4th at p. 414.) We therefore reject his constitutional claim.

(See Resp't's Lodged Doc. 4)

The Fifth DCA found that the trial court did not abuse its discretion in finding that the excluded evidence in question here was irrelevant and "plainly inadmissible." (Id.)

A federal court in a habeas proceeding does not review questions of state evidence law. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, the question here is not whether the state's exclusion of evidence violated state evidentiary rules, but whether the exclusion of evidence resulted in a decision contrary to or that involved an unreasonable application of established Supreme Court precedent. Id., Williams, 529 U.S. at 412. It is, in fact, possible for a state court to violate its rules of evidence without resulting in a trial so unfair as to violate due process. Jamaal, 926 F.2d at 919. "A state court's evidentiary rulings can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Osborne v. Purkett, 411 F.3d 911, 917 (8th Cir. 2005) (citing Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir. 1996)), cert. denied, 547 U.S. 1022 (2006).

1    "State and federal rulemakers have broad latitude under the Constitution to establish rules

2    excluding evidence from criminal trials." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006)

3    (quotations and citations omitted); <u>see also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996) (holding

4    that due process does not guarantee a defendant the right to present all relevant evidence).  This

5    latitude is limited, however, by a defendant's Sixth and Fourteenth Amendment rights to due process

6    and to present a defense.  <u>See Holmes</u>, 547 U.S. at 324.

7            "While the Constitution prohibits the exclusion of defense evidence under rules that serve no
             legitimate purpose or that are disproportionate to the ends that they are asserted to promote,
8            well-established rules of evidence permit trial judges to exclude evidence if its probative
             value is outweighed by certain other factors such as unfair prejudice, confusion of the issues,
9            or potential to mislead the jury."

10   <u>Id.</u> at 325-326; <u>see</u> <u>Egelhoff</u>, 518 U.S. at 42 (holding that the exclusion of evidence does not violate

11   the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and

12   conscience of our people as to be ranked as fundamental").  The defendant, not the state, bears the

13   burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions

14   and conscience of our people as to be ranked as fundamental."  <u>Egelhoff</u>, 518 U.S. at 47 (internal

15   quotations and citations omitted).

16           Applying these legal principles to Petitioner's proffered evidence, the Court cannot say that

17   the California Court of Appeal's conclusion upholding the trial court's exclusion of the evidence

18   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

19   established federal law, or was based on an unreasonable determination of the facts in light of the

20   evidence presented to the trial court.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 412; <u>Holmes</u>,

21   547 U.S. at 325-326; <u>Egelhoff</u>, 518 U.S. at 42.

22           The issue of relevancy is a very well-established evidentiary precept, with deep roots in

23   Anglo-American law.  California Evid. Code § 210 defines "relevant evidence" as "evidence

24   relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove

25   or disprove any disputed fact that is of consequence to the determination of the action."  This is

26   mirrored by Federal Rule of Evid. 401, "'Relevant evidence' means evidence having any tendency to

27   make the existence of any fact that is of consequence to the determination of the action more

28   probable or less probable than it would be without the evidence."

1    The trial court concluded that the "evidence that [the victim] was in possession of a rifle

2    some nine months before the shooting was irrelevant, specifically, as noted by the trial court, because

3    the weapon [the victim] allegedly had was a rifle as opposed to a handgun." Resp't's Lodged Doc.

4    4, at 17.  Also, "the evidence of [the victim's] 2000 conviction for being a felon in possession of a

5    gun was remote and also irrelevant, specifically because there was no other evidence that [the

6    victim] had a reputation for carrying a weapon or for aggression." Id.

7         The California Court of Appeal's concluded that the trial court did not abuse its discretion in

8    excluding evidence of Jesse Cotillier's testimony and of the victim's prior weapons conviction.

9    Based on the record, this ruling did not violate Petitioner's due process rights and was not contrary

10   to, or an unreasonable application of, clearly established federal law, nor was it based on an

11   unreasonable determination of the facts in light of the evidence presented to the trial court. See 28

12   U.S.C. § 2254(d); Williams, 529 U.S. at 412; Holmes, 547 U.S. at 325-326; Egelhoff, 518 U.S. at

13   42.  Accordingly, Petitioner's claim on this particular ground is denied.

14       D.  Cumulative Error

15       Petitioner's fourth claim alleges that the errors of the trial court were cumulative in their

16   effect, and taken together, were prejudicial and in violation of Petitioner's Fifth, Sixth, and

17   Fourteenth Amendment rights.  This Court has either rejected Petitioner's claims and/or found that

18   any errors, assumed or not, were not prejudicial.  Viewed cumulatively, there was no violation

19   Petitioner's of due process rights nor was any ruling not contrary to, or an unreasonable application

20   of, clearly established federal law, nor was any ruling based on an unreasonable determination of the

21   facts in light of the evidence presented to the trial court. See 28 U.S.C. § 2254(d); Williams, 529

22   U.S. at 412; Holmes, 547 U.S. at 325-326; Egelhoff, 518 U.S. at 42.  Accordingly, Petitioner's claim

23   on this particular ground is denied.

24   IV.   Certificate of Appealability

25       A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

26   district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-

27   El, 537 U.S. at 335-336 (2003).  The controlling statue in determining whether to issue a certificate

28   of appealability is 28 U.S.C § 2253 (2010), which provides as follows:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of precess issued by a State court; or

> (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly the Court hereby DECLINES to issue a certificate of appealability.

///

///

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.    The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

1        2.      The Clerk of Court is DIRECTED to enter judgment in favor of Respondent; and

2        3.      The Court DECLINES to issue a certificate of appealability.

3   IT IS SO ORDERED.

4   **Dated:     February 9, 2011**              **/s/ Lawrence J. O'Neill**
                                               UNITED STATES DISTRICT JUDGE